**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**EUGENIA WHITE**                                                              **PLAINTIFF**

**v.**                                            **CIVIL ACTION NO. 1:21-cv-190-TBM-RPM**

**KEESLER FEDERAL CREDIT UNION**                                   **DEFENDANT**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Eugenia White sued Keesler Federal Credit Union because she claims that Keesler discriminated against her based on her race and retaliated against her in violation of Title VII and 42 U.S.C. § 1981. White was a Senior Project Manager at Keesler until she was denied a promotion to a Director position and subsequently demoted from her Senior Project Manager position to a lesser Project Manager position. After filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), White was terminated.

Keesler moved for Summary Judgment [31], arguing that Keesler took no action against White because of her race, but instead all decisions were based on White's alleged diminishing work performance and poor communication skills.

Keesler's Motion is granted as to White's allegation of failure to promote because she was not qualified for the Director of Project Management position. But Keesler's Motion is denied as to White's demotion, termination, and retaliation claims. White has provided evidence that casts sufficient doubt on Keesler's reasons for her demotion and termination. White has also provided enough evidence that a reasonable fact finder could infer she was terminated in retaliation for her protected activity in filing a Charge of Discrimination with the EEOC and internally reporting to Keesler.

## I. BACKGROUND AND PROCEDURAL HISTORY

At the summary judgment stage, this Court must view the facts below in the light most favorable to White as the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In 2010, Keesler hired White—a Black woman—as an entry-level bank teller and quickly promoted her to Financial Service Representative. [39-1], p. 3. On September 5, 2016, White was promoted again to Project Manager with the Project Management Office. *Id.* at 2. During her time as a Project Manager, White received positive performance evaluations from 2016 to 2019. [39-3]. Jennifer Williams, Keesler's former Director of Project Management and White's direct supervisor, described White as a "solid communicator" and "[a] true asset to this team and to Keesler." [39-3], pps. 5, 9. Williams commented that she and White would "continue working toward [White's] near-term and long-term development goals to help her reach a [Senior] and potentially a Director level management position." *Id.* at 9.

White's 2017 performance evaluation has examples of the positive remarks that White received. Williams stated that White is "a rising project management star." *Id.* at 13. Williams was "excited to see what [White would] do after another year of experience." *Id.* at 13-14. The next year, Williams rated White as "Exceeds Expectations." *Id.* at 26. Williams again described White as "a solid communicator" and said that White "carries herself [well], even in difficult situations." *Id.* at 28. Further, Williams said White "set [ ] the standard for teamwork." *Id.* at 30.

Consistent with her performance evaluations, White was promoted to Senior Project Manager on May 26, 2019.[1] [39-1]. White was the only Black person in the Project Management department. *Id.* at 3. In the promotion announcement, Williams said White is "a team player, thorough, respectful and well-respected." [39-31]. In her first months as Senior Project Manager, White met expectations. [39-5]. In the 2019 performance evaluation, Williams described White's work as "not easy, but [White] is willing and is doing a fine job." [39-5], p. 10. Williams commented that White "has a natural instinct for the role." *Id.* at 11. Williams labeled White as her "go-to team member since she came to the [Project Management Office] in September [2016]." *Id.* at 12. The 2019 performance evaluation was completed on February 18, 2020. *Id.* at 2.

Jason MacDonald served as the Chief Information Officer for Keesler Federal Credit Union at least during the years of 2020 and 2021. [31-13]. On February 27, 2020, MacDonald, emailed White praising her "well-received" work in a meeting. [31-9], p. 4. MacDonald said "[l]ove to hear it, great job Gena!" *Id.* But internally, MacDonald began to display concerns to Williams about White's abilities. *Id.* Williams noted on April 2, 2020, that MacDonald expressed concerns about White's "skills and abilities related to communication and risk handling." *Id.* Williams observed that MacDonald's "concerns seem to be more opinions and that from what he was indicating . . . [White] was doing the job per [Williams'] direction." *Id.* Williams proposed that

---

[1] Keesler provided the job description for the Senior Project Manager position. [31-7]. The job description summary states that "Senior Project Managers will be responsible for assisting with the training and mentoring of Project Managers. Senior level Project Managers are expected to have mastered the expertise required to manage all phases of the project lifecycle. Effectively applies project management methodology in planning and development of project strategy to include defining project objectives, scope and schedule. Works with end users to gather requirements, forms recommendations on possible alternatives, and presents these alternatives to management to determine an action plan. Works closely with Project Sponsor and Project Owner to ensure project objectives are met. Responsible for managing designated timelines and ensuring issues are escalated appropriately. Regularly produces and delivers project status reports to project stakeholders. Communicates frequently with Executive Management and leaders of other business units during project assignments."

she "would check with other leaders who have had [White] on their projects to see if there was a parallel concern." *Id*. MacDonald did not support that idea. *Id*. Ultimately, Williams concluded that no further action was necessary. *Id*.

White conducted a meeting for one of her assigned projects on April 16, 2020, to determine whether the project was ready for launch. [28-3]; [39-11]; [39-38], p. 2. White explains in her deposition that this meeting was called a "go/no-go" meeting where as part of a go/no-go meeting, a vote is captured on whether the team thinks the project should launch. [28-3], p. 180. White voiced doubt as to readiness for the meeting, but MacDonald instructed that the meeting must continue as planned. [39-38], p. 3. The meeting had a negative outcome because in addition to other things, White claimed that "they were not ready to launch." [28-3], p. 176. The project was voted a "no-go" and was not launched. White and Williams discussed the meeting directly after the vote. Even though White wanted to continue the meeting at a later date because the project was not ready, Williams stated that "they could not 'call [her] boss [MacDonald] out on a meeting like that.'" [39-11].

In June 2020, Keesler conducted anonymous surveys after the project was finally launched. [31-10]. The survey results from White's co-workers were not positive for White concerning her performance. *Id*. White claims MacDonald blamed her for the failure of the April 16, 2020, project meeting and expressed that blame to other team members which caused her poor survey results. [39-10].

Shortly after, on September 8, 2020, Williams resigned from Keesler. [39-1], p. 1. When Williams announced her resignation, she warned White during one of their recorded conversations

that "[t]his place is going to be uncomfortable [for you] if I'm not here . . . to help."[2] [39-7]. Williams stated, "this is bout [MacDonald] . . . It's not about you." *Id.* [39-7].

After Williams' departure, White applied for the Director of Project Management position that Williams vacated in September 2020. [39-22]. Before Williams' departure, Keesler required Williams to perform an ad hoc performance evaluation of White and another Director applicant, Heather Valore ("Valore"). [39-9]. Williams told White the ad hoc review was a "surprise[,]" and that White should "read between the lines." *Id.* Williams said, "there's a lot that isn't known that, not even [Williams] talk[s] about." *Id.* Further, Williams relayed that White could "prove that what's been said [presumably on the anonymous surveys and on the ad hoc performance evaluation] is not the truth." *Id.* During this conversation, Williams described MacDonald as "a whole different level of evil." *Id.* Williams apologized to White and said she "put [White] in a position where [White] couldn't say what [she] needed to say." *Id.*

Five days before Williams' resignation, on September 3, 2020, MacDonald emailed Debbie McVadon, Keesler's Vice President of Human Resources, recommending that White not be considered to replace Williams because of her recent "low" performance. [39-22], p. 2. MacDonald also met with White to tell her she would not be considered for the opening. [39-8]. MacDonald and White discussed the survey responses at this meeting, which White claimed were inaccurate. *Id.* MacDonald replied that "perceptions are reality" and disagreed with White's

---

[2] White has submitted multiple recorded conversations as evidence to the Court. [39-7]; [39-8]; [39-9]; [39-11]; [39-12]; [39-13]; [39-14]; [39-26]; [39-35]; [39-36]; [39-38].

contention that the survey results were inaccurate. *Id.* Ultimately, Valore —a Caucasian female— was selected to replace Williams over White.[3] [31-13].

On October 14, 2020, Valore met with White to discuss the ad hoc performance evaluation that Williams conducted for White before her resignation. [39-14]. At that meeting, Valore informed White she was being demoted from Senior Project Manager to Project manager. *Id.* Valore explained that the results of the ad hoc review and Valore's "own observations" merit White's demotion from Senior Project Manager to Project Manager.[4] *Id.* White appealed the review and got the results of her review changed from "Needs Improvement" to "Meets Expectations" on January 19, 2021. [31-16].[5] Yet, Keesler did not reverse its decision to demote White.

On February 5, 2021, White timely filed a Charge of Discrimination with the EEOC alleging that Keesler discriminated against her based on her race when she was demoted. [4-1]. White's

---

[3] To avoid confusion with the name of the Plaintiff, if the Court is referencing the race of white people, it will use the term "Caucasian."

[4] Keesler provided the Project Manager job description to the Court. [31-12]. The summary of the job states that "[The Project Manager] manages projects through the entire project lifecycle. Effectively applies project management methodology in planning and development of project strategy to include defining project objectives, scope and schedule. Works with Business Process Analysts and end users to gather requirements, forms recommendations on possible alternatives, and presents these alternatives to management to determine an action plan. Works closely with Executive Sponsor and Project Owner to ensure project objectives are met. Responsible for managing designated timeliness and ensuring issues are escalated appropriately. Regularly produces and delivers project status reports to project stakeholders. Communicates frequently with the Sr. Project Manager, Director of Project Management, Executive Management and leaders of other business units during project assignments."

[5] The Court notes that the ad hoc performance review was not submitted by either party, so the Court cannot say with certainty exactly what Williams said in the review. Instead, the Court has a memo from Debbie McVadon stating in sum that because of White's appeal of the performance review and because the person who performed the review was no longer employed at Keesler preventing White from appealing directly to Williams, the CEO had the review deleted from White's record and her performance changed from "Needs Improvement" to "Meets Expectations." [31-16]. White also submitted evidence of records showing that more than a month after Williams completed White's ad hoc performance review, Valore, and MacDonald went back into the review and altered it. [39-37].

6

supervisor was changed from Valore to Steve Money on March 1, 2021.[6] [39-18]. On March 4, 2021, the EEOC provided White a right to sue letter. [4-2]. During this time, White was out on medical leave between February and March 22, 2021. [39-16].

When White returned to Keesler, she met with Valore where she expressed that she was mistreated by MacDonald and Valore because she is Black. [39-12]. On April 27, 2021, Valore criticized White's communication skills. [39-25]. White confronted Valore and claimed that the communication issues were "because of [a] personal reason, because [White is] Black and [she is] absolutely sick of it." [39-12]. So White filed a discrimination grievance with Keesler's Vice-President of Human Resources Debbie McVadon. [39-25]. Valore approached White the next day and asked why White made such a claim. [39-13]. When White tried to explain her reasoning, Valore "dismissed her assertions." *Id.*

Valore then began preparing notes to support disciplining White. [39-24]. On May 10, 2021, White reported to McVadon that she was not only being discriminated against but also endured retaliation from MacDonald, Valore, and Money. [39-25]. That same afternoon, Keesler issued White a write-up based on her work performance. [39-15].

White claimed that Keesler's first write up was retaliation for reporting discriminatory behavior from her supervisors. [39-26]. The next day, McVadon asked for White to provide examples of discrimination. [39-28], p. 1. White provided her seven pages of examples to McVadon on May 13, 2021, at 3:54 p.m. *Id.* at 4-15. White also told McVadon that she had other examples

---

[6] The Interrogatory responses provided the chain of command for White. [39-1]. She reported to Senior Project Manager Steve Money; who reported to Director of Project Management Heather Valore; who reported to Chief Information Office Jason MacDonald; who reported to KFCU's President and CEO, Andrew Swoger. [39-1], pg. 4. Jennifer Williams reported to Jason MacDonald before she left Keesler and Heather Valore took over her position. *Id.*

she could provide when they met, but the meeting never happened. *Id.* Just minutes later, Valore added another Discipline Record to White's file at 3:57 p.m. and recommended White's termination. [39-29]. White's claims were never investigated because the next day on May 14, 2021, McVadon and Valore terminated White with the approval of MacDonald and Andrew Swoger, Keesler's President. [31-6]; [39-30]. The reasons Keesler provided for White's termination were:

> (1) That the test plan and detailed requirements had not been completed.
>
> (2) White had not responded to an email on May 12, 2021, about how defects [for one of White's projects] are being tracked.
>
> (3) That the Senior Director of Enterprise Applications sent an email with defects in the body.
>
> (4) That White did not respond to emails on May 12, 2021, and May 13, 2021, from Money asking about uncompleted tasks and whether there is risk to the project.
>
> (5) On May 11, 2021, Money asked to be included in meetings, and then had to ask a second time when he did not immediately get the invitations. [31-6].

White declared that, for Keesler's first proffered reason, the test plan details were worked out in a previous meeting.[7] [39-38], p. 6. White also claims these details should have been completed by another project manager since White was out on leave right before the deadlines for the project. *Id.* Regarding Keesler's second reason, White alleges that she responded to the May 12, 2021, email the next day. *Id.* As to the email with defects, White asserts she "specifically asked

---

[7] No further context about the "previous meeting" has been provided to the Court by either party. That said, White states that while she was out on FMLA leave, it was Valore's responsibility to have someone else keep up with her work and that the test plan details should have begun before she was assigned the project. [39-38].

[Alex Schloegel] not to send the email."[8] *Id.* But this email was apparently sent because Scholegel claimed that she "had to follow her boss's instructions anyway or she would be retaliated against too." *Id.* Finally, regarding the fifth and final reason offered by Keesler, White claims that the meetings Money requested to be invited to were not meetings at all, but instead time that White blocked off to work on the project by herself. *Id.*

White sued Keesler in this Court on June 2, 2021. [4]. White also filed a second Charge of Discrimination with the EEOC on June 28, 2021. [4-3]. The EEOC provided White a right to sue letter on January 3, 2022. [4-4]. After exhausting her claims with the EEOC, White amended her lawsuit to include her second EEOC Charge on January 4, 2022. [4]. After discovery completed, Keesler then moved for Summary Judgment [31], asking to dismiss White's claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). It is the burden of the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there is a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

"A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & Tres Arboles, L.L.C.*, 736 F.3d 396, 400

---

[8] The parties do not clarify what position Alex Schloegel held at Keesler, or why Schloegel's action of sending an email would stand as a bad reflection on White.

(5th Cir. 2013) (quotation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

It is not permissible to make credibility determinations or weigh the evidence at the summary judgment stage. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citation omitted). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). Yet "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).

### III. RACE DISCRIMINATION – TITLE VII & *MCDONELL DOUGLAS* BURDEN SHIFTING FRAMEWORK.

In this section, the Court will evaluate all three of White's discrimination claims individually using the *McDonell Douglas* burden shifting framework. First, the Court will evaluate whether White has proven a prima facie case of discrimination for her claim of "failure to promote." Next, it will evaluate White's second claim of a job demotion. Last, the Court will evaluate whether White has survived her burden for her claim of termination. After the first part of the *McDonell Douglas* burden shifting framework, each subsequent part will be evaluated only if the parties' burdens are met at the previous stage.

10

Title VII makes it unlawful for an employer to discriminate against an employee "because of" her race.[9] *See* 42 U.S.C. § 2000e—2(a)(1); *see* 42 U.S.C. § 1981 (prohibiting intentional racial discrimination).  Because White lacks direct evidence[10] of discrimination, this Court must apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *see Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020).

The *McDonnell Douglas* framework requires White to make a prima facie case of race discrimination. The burden of production then shifts to Keesler to proffer a legitimate, nondiscriminatory reason for its action. *See Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016). If Keesler makes this showing, "the presumption of discrimination disappears," and White "must then produce substantial evidence indicating that the proffered, legitimate[,] nondiscriminatory reason is a pretext for discrimination." *Outley*, 840 F.3d at 216.

White asserts Keesler has discriminated against her based on her race three times: when it did not promote her to the Director of Project Management position, when she was demoted, and when she was terminated. [4].

---

[9] While White brings her discrimination claims under Title VII and Section 1981, the Court refers "only to Title VII, because 'when used as parallel causes of action, Title VII and Section 1981 require the same proof to establish liability,' and 'it would be redundant to refer to both of them.'" *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 n.3 (5th Cir. 2016) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999)).

[10] In the context of Title VII, the Fifth Circuit has defined direct evidence of discrimination as "any statement or written document showing a discriminatory motive on its face; a statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action is direct evidence of discrimination." *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177 (5th Cir. 2018) (internal citations omitted).

**A. White does not meet her burden of proving a prima facie case related to Keesler not promoting her.**

Under the *McDonell Douglas* framework, White must "first demonstrate a prima facie case" of discrimination. *Outley*, 840 F.3d at 216. To establish a prima facie case of discrimination, White must show she: "(1) is a member of a protected group; (2) was qualified for the position as issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside h[er] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Sanders*, 970 F.3d at 561 (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

The parties do not dispute that White is a Black woman and belongs to a protected group, that she suffered an adverse employment action, or that she was replaced by a person outside of her protected class. Instead, Keesler argues that White has not met the second element of a prima facie case because White was not qualified for the Director position for which she sought to be promoted. [39-23]; [32], p. 1.

White applied for the Director of Project Management position in September 2020. [39-22]. Keesler's job description for the Director position required "[a] minimum of ten years of similar or related experience leading and directing project teams to deliver projects within the constraints of the project specifications is required."[11] [31-2], p. 68. To show she satisfied the job qualifications, White alleges that she had the required ten years of project management experience

---

[11] Neither party provides the full job description for the Director of Project Management position. But some requirements for the position were discussed in White's deposition. [28-3].

on other jobs but was never named a project manager on those jobs.[12] [28-3]; [31-2], p. 68. When White applied for the position she had worked at Keesler for ten years. [39-1] While White had worked in many positions at Keesler (she began as a teller in 2010), she did not have the required ten years of project management experience for the Director position. [39-22]. To be sure, White had only worked in her Senior Project Manager position "for about a year" and Williams, White's former supervisor, "wouldn't expect [White] to submit [an application for the Director position]."[13] *Id.* White had worked in a Project Manager position at Keesler from 2016 until 2020 before her termination. [39-1]; [28-3]. Thus, White had only four years of similar or related experience at Keesler and did not have the necessary ten years of experience to be qualified for the

---

[12] In White's deposition [28-3], p. 286-87, it was pointed out that in her cover letter for the Director of Project Management position, White had stated that she had seven years of project management experience even though she did not hold the title of Project Manager or Senior Project Manager for that amount of time. It is also noted that on White's resume she did not indicate whether she had done project management tasks outside of Keesler to achieve the required ten years of experience. White stated that "[t]here are indications in some of the descriptions that are indicative of project manager activities." When asked to clarify based on her resume, White points out "items under CPSI" which said "… quality assurance and testing of software applications to ensure compliance with performance standards and design specifications. Resolved application issues or concerns for multiple hospitals and clinics in a timely, professional manner." But even with that addition, White's project direction experience only added up to four years and seven months. White clarifies that before she was a Project Manager at Kessler, she worked on projects that required skills of a project manager but again was not named project manager, indicating that one would have to reason that those certain skills, even though she lacked the title of Project Manager, would show she had the required ten years of experience. Yet, White provides no analysis or law that would allow her to clear the qualifications hurdle based on that information.

[13] Keesler provides different reasons as to why White was not promoted. In Jason MacDonald's declaration he states that he informed White she would not be promoted to the Director position because she had not been in the Senior Project Management position long enough. [31-13]. In an email from MacDonald to McVadon, he said the reason White would not be promoted was because of her low performance. [39-22]. But in its Motion for Summary Judgment, Keesler argues that the reason White was not promoted was that she was not qualified for the position and that she had long standing performance issues. [32], p. 1, 14.

Director position when she applied in September 2020. *Id.* In contrast, it is undisputed that Heather Valore had the requisite years of project management experience.[14] [31-13].

In *Davis*, the Fifth Circuit found that summary judgment was appropriate when the plaintiffs could not show a prima facie case for failure to promote when they did not meet the job qualifications. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004). There, the employer had two job postings in December 2001 and April 2002 for open lieutenant positions. *Id.* at 317. In the first posting, a bachelor's degree and seven years peace officer experience, including at least one year as a sergeant, was required. *Id.* Two months later, in February 2002, the Chief Police Officer announced in a memo that a revised posting would be circulated.[15] *Id.*  The plaintiffs applied for the position in January 2002, before the revised notice was published. *Id.* at 318. The employer determined that neither plaintiff met the minimum qualifications under the first posting or the revised posting because they did not have the requisite supervisory experience. *Id.* Because the plaintiffs lacked the qualifications, the employer informed the plaintiffs they could not advance further in the promotion process. *Id.* The plaintiffs challenged this determination and claimed that they were denied the promotion because of their race. *Id.* The Fifth Circuit determined that the plaintiffs had met all the qualifications except having peace officer experience which was required

---

[14] Heather Valore's resume shows that from 1996 to 2007, she worked as a Project Manager at Regions Financial Corporation. [31-13]. Further at Hancock Bank she worked as a Project Manager from 2011 to 2013. *Id.* At both Regions and Hancock, Valore was promoted to other positions, but the Court is unsure if those roles were the same or similar to a Project Managers role. Still, she served as a Project Manager and Senior Project Manager at Keesler from 2019 until 2020 when she was promoted to the Director pf Project Management Position. [31-14].

[15] The new, revised posting "still require[d] candidates to have at least seven years' experience as a full-time Texas peace officer, including one year supervision. However, the one year of supervisory experience at the rank of Sergeant or above can be in civilian or police work or in any equivalent capacity in the military. We want to take advantage of either civilian or military leadership experience since our internal applicants could possess either or both. For military supervisory experience, candidates must have held at least the pay grade of E–6 or higher." *Davis*, 383 F.3d at 317.

under each job posting. *Id.* As a result, the plaintiffs "qualifications were facially insufficient to satisfy the minimum criteria under either of the postings for the lieutenant positions." *Id.*

Similarly, like the plaintiffs in *Davis*, White lacks evidence that she had the ten years of experience necessary for the Director position or that her experience was more than that of Valore who was hired for the position. Instead, she just states in a fairly conclusory manner that she had the required experience or that she participated in project manager opportunities without the title. [28-3], [31-2], p. 68. The evidence is simply lacking. In contrast, Keesler offered MacDonald's testimony and Valore's resume showing that Valore had the necessary experience to hold the Director position. [31-13]. As in *Davis*, this Court finds that White's "qualifications were facially insufficient to satisfy the minimum criteria [for the Director of Project Management position]" because she lacked the required ten years of relevant necessary for the job. *Davis*, 383 F.3d at 318. White has not carried her burden to establish a prima facie case on her failure to promote claim. *Id.*; *Kebiro v. Walmart*, 193 F. App'x 365, 368 (5th Cir. 2006) (holding plaintiff did not meet his burden when plaintiff could not produce evidence they had any supervisory experience to be considered for any of the management positions that he applied for and therefore defendant was entitled to summary judgment); *Fortenberry v. Texas*, 75 F. App'x 924, 927 (5th Cir. 2003) (finding plaintiff did not meet her prima facie case burden because she submitted no evidence to show that she applied for a position that she was qualified for and was denied promotion).

**B. White has provided evidence showing Title VII racial discrimination due to her demotion from Senior Project Manager to Project Manager.**

Though White was not qualified for the *Director* level position in 2020, she was previously promoted to Project Manager in 2016, and to Senior Project Manager on May 26, 2019. [39-1], p.

2. White's second claim of racial discrimination involves her demotion from Senior Project Manager to Project Manager. [4], p. 8.

**1. White has met her burden in making a prima facie case for racial discrimination as it relates to her demotion.**

As with White's first allegations, the parties do not dispute that White is a Black woman and belongs to a protected group, that she suffered an adverse employment action in being demoted, or that she was replaced by a person outside of her protected class. Keesler instead claims that because of White's poor performance, she was not qualified for the Senior Project Manager position. [39-14].

Yet, Keesler has not given the court any legal authority to support the claim that someone who was originally qualified for a position at a company can then become unqualified based on *performance*. Indeed, the *McDonnell Douglas* framework allows for Keesler to raise performance issues at this stage of providing legitimate nondiscriminatory reasons for demotion. Still, even if Keesler had submitted legal authority to support its claim that an employee can become unqualified, White has presented a genuine issue of material fact because she has submitted evidence of positive performance reviews in addition to the evidence of changes to the ad hoc performance review which was the basis for White's demotion. [39-3]; [39-5]; [39-20]; [31-16]. This evidence is set forth in more detail below.

Thus, White has put forward a prima facie case of racial discrimination because of her demotion. *See Owens*, 33 F.4th at 825.

**2. Keesler has met its burden by providing legitimate, nondiscriminatory reasons for White's demotion.**

At this point in the *McDonnell Douglas* burden-shifting framework, Keesler must produce legitimate, nondiscriminatory reasons for taking its adverse employment action against White.

16

*Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021). Keesler's "burden is merely one of production; as such, 'it can involve no credibility assessment.'" *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007), *abrogated by Hamilton v. Dallas Cnty.*, No. 21-10133, 2023 WL 5316716 (5th Cir. Aug. 18, 2023) (quoting *Reeves*, 530 U.S. at 142).

Keesler provides two reasons for White's demotion: (1) White's communication issues as described by Heather Valore, the recently promoted Director of Project Management, who was promoted over White and (2) the "needs improvement" score on the 2020 ad hoc performance evaluation. [39-14]. The Court notes, however, that Keesler concedes that White was qualified for the Senior Project Manager position *when she was promoted* to it in May 2019 and held the position for over a year. [39-1].

In *Patrick*, the Fifth Circuit found that to articulate a nondiscriminatory reason with "sufficient clarity" an employer, though able to rely on subjective reasons for its personal decision, must "articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). An employer's reason that an employee is "not sufficiently suited" is not enough to meet the required "sufficient clarity" standard. *Id.* The Fifth Circuit reasoned that "neither we nor Patrick can identify the kind of evidence needed to demonstrate that such a rank generalization is or is not pretextual." *Id.*

In the same sense, here, Valore's personal observations about White's communication issues without specifying with clarity the reason for White's demotion is not enough to establish a legitimate, nondiscriminatory reason for demoting White. *See Patrick*, 394 F.3d at 317 (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

Keesler simply provides no clarity regarding the "communication issues" —much less "sufficient clarity."

However, Keesler's second reason for White's demotion was that White's 2020 performance evaluation stated that she "needs improvement." [31-16]. Keesler argues in its brief that "White was not meeting Keesler Federal's expectations in the Senior Project Manager role [and therefore was demoted]." [32], p. 16. This second reason meets the burden of establishing a legitimate, nondiscriminatory reason for demoting White. In *Burton*, the employer's reason for terminating the plaintiff was because of poor work performance as shown in performance reviews. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015). There, the Fifth Circuit held that "[w]e are not to assess the employer's credibility or the truthfulness of its reason at this stage of the inquiry." *Id.* So long as the employer made its decision on poor performance and citing specific examples, they had met their burden and shifted the burden back to the plaintiff. *Id.* at 233. Here, at this stage of the *McDonnell Douglas* burden-shifting framework, this Court is not to assess whether this reason is the true reason for demoting White.

Thus, White's 2020 poor performance evaluation is enough to meet this burden. *See Burton*, 798 F.3d at 231.

**3.  White has provided substantial evidence to rebut the reasons Keesler provided such that a reasonable fact finder would infer pretext and thus find a claim of racial discrimination for her demotion.**

Since Keesler produced a legitimate, nondiscriminatory reason for demoting White, under the modified *McDonnell Douglas* framework the "presumption of discrimination disappears and [White] 'bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [Keesler] intentionally discriminated against her because of her protected status.' "

*Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)). White must provide substantial evidence to raise a genuine issue of fact as to pretext. *Wallace*, 271 F.3d at 219-20. In other words, White "must put forward evidence rebutting each of the nondiscriminatory reasons [Keesler] articulates." *Id.*

Pretext is defined as a false reason given for an adverse employment action that hides or serves as a cover-up of the employer's true motive for the action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S. Ct. 1817, 1826, 36 L. Ed. 2d 668 (1973), holding modified by *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993); *Godfrey v. Katy Indep. Sch. Dist.*, 395 F. App'x 88, 91 (5th Cir. 2010) (finding that pretext can be seen as "a coverup for a [] discriminatory decision"); *Barnes v. Bd. of Tr. of Univ. of Ill.*, 946 F3d 384, 389-90 (7th Cir. 2020) (describing pretext as not "just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'").

The issue can also be framed as "whether [the employer's] reason, even if incorrect, was the real reason for [the plaintiff's] termination." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). To establish pretext, White must specifically show that Keesler's "proffered

explanation is false or 'unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (quoting *Wallace*, 271 F.3d at 221).[16]

"Employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [Keesler] made a wise or even correct decision to [demote White]." *Owens*, 33 F.4th at 826 (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)). "Instead, '[t]he ultimate determination . . . is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable fact finder could infer discrimination.'" *Id.* (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)). "Employers are 'entitled to be unreasonable' in [demoting and] terminating their employees 'so long as [they] do [ ] not act with discriminatory animus." *Owens*, 33 F.4th at 826 (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). "[I]t is the employee's burden to create a fact dispute as to reasonableness that could give rise to an inference of discrimination." *Owens*, 33 F.4th at 826 (citing *Sandstad*, 309 F.3d at 899). "A plaintiff need only bring evidence that enables the jury to disbelieve that the employer's proffered justification truly motivated the adverse employment action." *Laxton*, 333 F.3d at 580 n.2 (citing *Reeves*, 530 U.S. at 147).

---

[16] Other circuits are similar to the Fifth Circuit regarding what is needed to show pretext at this stage. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) ("[t]o show pretext, an employee must demonstrate such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence."); *see also Nahas v. Shore Med. Ctr.*, 828 F. App'x 89, 92 (3d Cir. 2020) ("[t]o establish pretext at summary judgment, a plaintiff must provide evidence that [either] []casts sufficient doubt upon ... [the] reasons proffered ... so that a fact finder could reasonably conclude that each reason was a fabrication or [] allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."); *see also Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1216 (10th Cir. 2022) (holding that to show pretext, the plaintiff must establish that the employer's proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude the reasons were unworthy of belief.").

To evaluate a claim of pretext, "a court should consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Crawford*, 234 F.3d at 902. In some cases, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (emphasis in original). "But evidence of falsity must be of sufficient 'nature, extent, and quality' to make the inferential leap to discrimination a rational one." *Owens*, 33 F.4th at 826 n.7 (quoting *Crawford*, 234 F.3d at 903). The Supreme Court explained in *Reeves*, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory." 530 U.S. at 148. That said, this case is not one of those cases.

Keesler's reason for demoting White was the 2020 ad hoc performance evaluation that concluded White "needs improvement." [39-14]. But the "needs improvement" score was deleted by Keesler's President, and White's review was amended to "meets expectations" after her appeal. [31-16]. Still, Keesler did not reinstate White to Senior Project Manager after the 2020 ad hoc performance evaluation was changed and removed from her record.

White also taped conversations that she had with bosses and co-workers, and she submitted these voice recordings supporting her rebuttal of Keesler's reasons for the demotion.[17] For example, White and Williams, White's previous supervisor, had a conversation. In that conversation, Williams claims the requirement to perform the ad hoc performance evaluation was a "surprise." [39-9]. Williams explained that the ad hoc performance evaluation was "not consistent with [Keesler] policy or [with Williams'] expectations." *Id.* Williams confided in White that "there are things in [the evaluation that she had] no choice but to put." *Id.* During this discussion, Williams described MacDonald as "a whole different level of evil." *Id.* She explained to White that her reason for resigning was because of MacDonald. *Id.* Williams admitted to White she made "the wrong choice" and "put [White] in a position where [she] couldn't say what [she] needed to say" regarding the ad hoc performance review and the anonymous surveys. *Id.* And that she wouldn't be able to protect White once Williams left Keesler. *Id.*

Keesler alleges the 2020 ad hoc performance evaluation was written by the former Director of Project Management, Jennifer Williams. [31-11], p. 1. But White provided the editing history of the 2020 performance evaluation which—when viewed in the light most favorable to White— shows changes made by Heather Valore and Jason MacDonald between October 9, 2020, and

---

[17] Along with the recordings White included a declaration stating: "[White] took these recordings [herself], and they are true, complete, and unedited recording[s] of the meetings they depict." [39-38], p. 2. White identified the individuals and subject matter of the recordings within her declaration. *Id.* at 2-3. At a hearing on the Motion for Summary Judgment [31], Keesler proffered unpersuasive arguments about White's recording evidence being inadmissible as not being authenticated or as hearsay. The Court questioned whether these recordings would be admissible as admissions by a party opponent. Keesler had no answer on that point and for purposes of summary judgment, the Court finds the recordings are competent summary judgment evidence. For purposes of summary judgment, the Court finds the recordings are competent summary judgment evidence. The Court reserves the right to make an evidentiary finding on White's recording evidence at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding that the nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

October 15, 2020, after Williams' departure in September 2020. [39-37]. Since the results of the performance evaluation were reversed and edits were made by individuals other than the purported author of the performance evaluation, White has "cast[ ] doubt on the credence of [Keesler's] proffered justification" for demoting her. *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020), as revised (Aug. 14, 2020) (citing *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019).

The Fifth Circuit has explained that after a plaintiff has put forth evidence establishing an employer's explanation "is false or unworthy of credence, taken together with the plaintiff's prima facie case," "[n]o further evidence of discriminatory animus is required." *Laxton*, 333 F.3d at 578 (citing *Sandstad*, 309 F.3d at 897; *Reeves*, 503 U.S. at 147-48; *See also Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 794 (8th Cir. 2011) (internal citations omitted) ("the falsity of a nondiscriminatory explanation may support a finding of pretext."). "[B]ecause 'once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation.'" *Id.* (quoting *Reeves*, 530 U.S. at 147-48).

Thus, because White has put forth evidence to rebut Keesler's reasons as pretextual, and viewing the facts in the light most favorable to White, the Court finds there are genuine issues of material fact as to whether demoting White for her alleged poor performance was pretext for race discrimination. *See Burton*, 798 F.3d at 236; *White v. Patriot Erectors LLC*, 2023 WL 3400552 (W.D. Tex. May 11, 2023) (holding plaintiff's showing of pretext "was legally sufficient for a jury to find discrimination" when he could detail his job performance at length at trial among other showings).

## C. White has provided evidence showing Title VII racial discrimination due to her termination as a Project Manager with Keesler.

Finally, White claims she was terminated because of her race. [4], p. 9.

White has proved a prima facie case of racial discrimination. Again, it is undisputed that White is a Black woman and belongs to a protected group, that she suffered an adverse employment action, and that she was replaced by a person outside of her protected class. White was also qualified for the Project Manager position as Keesler originally hired her for that position in September 2016 and White held the position for almost three years before her promotion to Senior Project Manager in May 2019.[18] [39-1]. White also did a stellar job as a Project Manager according to her performance reviews. [39-3]. This has relevance as: (1) White had performed as Project Manager in a very capable fashion resulting in a promotion; and (2) as the Court has now found, White has also highlighted a jury question on whether her demotion back to Project Manger was unlawful. With this context, the Court now turns to whether Keesler has provided legitimate, nondiscriminatory reasons for terminating White as Project Manager.

**1. Keesler has provided legitimate, nondiscriminatory reasons as to White's termination.**

Keesler must produce legitimate, nondiscriminatory reasons for taking its adverse employment actions. *Watkins*, 997 F.3d at 282. Keesler cites the reasons below for White's termination based on the Employee Discipline Record issued by Valore:

(1) That a test plan and detailed requirements had not been completed.

(2) White had not responded to an email on May 12, 2021, about how defects are being tracked.

---

[18] In the 2019 performance evaluation, Williams described White's work as "not easy, but [White] is willing and is doing a fine job." [39-5], p. 10. Williams labeled White as her "go-to team member since she came to the [Project Management Office] in September [2016]." *Id.* at 12. These observations indicate to the Court that White not only held the *Senior Project Manager* position showing that she was qualified, but that she was doing a decent job as Senior Project Manager.

(3) That the Senior Director of Enterprise Applications sent an email with defects

in the body.

(4) That White did not respond to emails on May 12, 2021, and May 13, 2021, from

Money asking about uncompleted tasks and whether there is risk to the project.

(5) On May 11, 2021, Money asked to be included in meetings, and then had to ask

a second time when he did not immediately get the invitations. [31-6].

The Court is "not to assess the employer's credibility or untruthfulness of its reason at this stage of the inquiry." *Burton*, 798 F.3d at 231 (citing *Patrick* 394 F.3d at 318). And mere disputes over an employer's assessment of an employee's performance do not create issues of fact." *Owens*, 33 F.4th at 831 (citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020)). White does not dispute these justifications satisfy the second step of *McDonnell Douglas*. [38], p. 24. Thus, the Court finds Keesler has met its burden and offered a legitimate, nondiscriminatory reason for its actions. We continue to the third step of the *McDonnell Douglas* burden-shifting framework: pretext.

**2. White has met her burden of providing evidence rebutting Keesler's reasons for her termination to show pretext for racial discrimination.**

Since Keesler produced a legitimate, nondiscriminatory reason for terminating White, White now "bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [Keesler] intentionally discriminated against her because of her protected status." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)).

Pretext is again defined as a false reason given for an adverse employment action that either hides or serves as a cover-up of the employer's true motive for the action. *McDonnell* 411 U.S. at

805. To evaluate a claim of pretext, "a court should consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Crawford*, 234 F.3d at 902.

In the analysis, the Court will first address Keesler's specific reasons for terminating White and will then consider White's rebuttal evidence. *See Burton*, 798 F.3d at 233 (citing *Laxton*, 333 F.3d at 580 (first analyzing the employer's specific alleged justifications, then considering "other evidence that undermines the overall credibility of [the employer's] proffered justification[s].")).

White rebuts Keesler's justifications for terminating her with evidence from recordings between herself and other individuals at Keesler, business records showing her positive performance reviews, and her own declaration. [39-3]; [39-7]; [39-9]; [39-38]. This Court has already determined that the recording evidence is admissible at this stage of the proceedings. *See Donelon*, 521 F.3d at 329; *United States v. Buchanan*, 70 F.3d 818, 827 (5th Cir. 1995) (holding that a district court has broad discretion in determining whether a sound recording should be admitted) (citing *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977)).

### a. Keesler's first reason: the test plan and detailed requirements for a project that White was assigned had not been completed.

Whether White completed the test plan and requirements for a project that she was assigned is hotly disputed. [39-33], p. 4. A tape recording of the disciplinary meeting on May 10, 2021, shows Valore, "knew these items had been completed and were just awaiting review from someone who was out on leave." [39-26]. In that same recording and in her declaration, White states that while she was out on FMLA leave, it was Valore's responsibility to have someone else keep up with White's work and that the test plan details should have begun before she was assigned the project. *Id.*; [39-38].

Along with the recording from the May 10, 2021, disciplinary meeting, White also proffered recording evidence and emails that the test plan and detailed requirements were simply awaiting review.[19] [39-34]; [39-33], p. 4. Since the recordings and documents rebut Keesler's assertion that the test plan and requirements were incomplete, the Court finds that a reasonable fact finder could conclude Keesler's first reason for terminating White was false. *See Burton*, 798 F.3d at 235.

**b. Keesler's second reason: White had not responded to an email on May 12, 2021, about how defects are being tracked.**

Second, we turn to whether White replied to an email from Valore. [31-6]. White contends *she responded* to the email and that she was criticized "for taking one (1) day to respond to an email." [39-38], p. 6; *see White v. Patriot Erectors LLC*, 2022 WL 5071444, *6 (W.D. Tex. Oct. 3, 2022) (finding plaintiff's declaration competent summary judgment evidence). White also points to Keesler's disciplinary policy alleging that "[n]othing in Keesler['s] policy would suggest that a delay of one day in responding to an email is a terminable offense." [38], p. 22.

"When an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext." *Goudeau v. Nat'l Oillwell Varco, L. P.*, 793 F.3d 470, 477 (5th Cir. 2015) (citing *Machinchick*, 398 F.3d at 350). Keesler's "progressive discipline" policy states it "should follow a rolling 12-month period… [and] progressive disciplinary steps will be followed unless otherwise specified." [39-2]. Apparently, Keesler never warned White that taking one day to respond to an email would result in termination. Because Keesler did not follow its progressive discipline policy and based on all of the other circumstances

---

[19] In light of White's rebuttal for this proffered reason and for the rest of them, Keesler does little to provide any other context for Keesler's reasons or why White's rebuttal is wrong. Instead, Keesler essentially just says White's rebuttal evidence and the tape recordings should be ignored.

surrounding White's employment detailed in this opinion, a reasonable fact finder could infer pretext. *See Burton*, 798 F.3d at 239-40; *Goudeau*, 793 F.3d at 476-77.

**c.  Keesler's third reason: the Senior Director of Enterprise Applications sent an email with defects in the body.**

Third, the Court turns to whether White was responsible for an email sent by another Keesler employee that included defects in the body. [31-6]. White declared that she "specifically asked [Alex Schloegel], her coworker, not to send the email. She told [Schloegel] that they were probably asking her to do this to get [White] in trouble because [White] filed a grievance against [Valore and MacDonald]." [39-38], p. 6. White declared that Schloegel replied, "she had to follow her boss's instructions anyway or [Schloegel] would be retaliated against." [39-38], p. 6. When giving all reasonable inferences in favor of White and based on all the other circumstances surrounding White's employment detailed in this opinion, this Court finds that White has provided specific allegations to rebut Keesler's third reason for terminating her. *See Owens*, 33 F.4th at 833 (citing *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)).

**d.  Keesler's fourth reason: White did not respond to emails on May 12, 2021, and May 13, 2021, from Money asking about uncompleted tasks and whether there is risk to the project.**

Fourth, White disagrees with Keesler's contention that she did not respond to emails on May 12 and 13, 2021, from Steve Money, her then direct supervisor. White sufficiently rebuts this reason with recording evidence of a "standup" meeting on May 13, 2021. [39-36, 28-3]. White explained at this meeting that there were defects with the project, and she was awaiting fixes to the defects before sharing the testing information. *Id.* White explained that she was instructed to wait to respond by Farshid Jabbari, Senior Director of Enterprises. *Id.* She also alleges that she responded to the May 12, 2021, email the next day on May 13, 2021, the same day of the "standup meeting."[39-38]. Like Keesler's second reason, neither party has put forth evidence that White

28

did not reply to the email or that failure to reply to an email within a specific time frame is a terminable offense—especially given that she was told to wait by a Senior Director. *See Goudeau*, 793 F.3d at 476-77.

In light of Keesler's progressive discipline policy and all the other circumstances surrounding White's employment, this Court finds that White has sufficiently rebutted Keesler's fourth reason for her termination.

**e.  Keesler's fifth and final reason: On May 11, 2021, Money asked to be included in meetings, and then had to ask a second time when he did not immediately get the invitations.**

As to Keesler's final reason, White declares that the meetings Keesler alleged Steve Money was not invited to attend, in fact did not exist. [39-38]. White apparently argues that someone at Keesler looked at White's electronic calendar and complained that White was supposed to invite Money to every meeting. But the meetings "were not actually meetings, but just calendar entries [she] made to set aside a few blocks of time to work on the project by [herself]." [39-38], p. 6.

Viewing this evidence in the light most favorable to White, this Court finds that White has produced substantial evidence to rebut Keesler's final reason for her termination. *See Owens*, 33 F.4th at 833 (finding plaintiff presented evidence "that directly and specifically contradicts several factual bases" of employer's reasons); *Gosby*, 30 F.4th at 529; *White*, 2022 WL 5071444, at *7; *Cherry v. Premier Prints, Inc.*, No. 1:21-CV-59-SA, 2022 WL 3636606, at *9 (N.D. Miss. Aug. 23, 2022) (holding summary judgment improper and "[i]t is not the court's role on summary judgment to weigh competing evidence or make credibility determinations.").

The Court next turns to White's other evidence "that undermines the overall credibility of [Keesler's] proffered justification[s]." *See Laxton*, 333 F.3d at 580.

**3.  Keesler's Progressive Discipline Policy and the Timing of White's Termination.**

Finally, on top of rebutting Keesler's reasons for her termination, White also introduces Keesler's "progressive discipline" policy to suggest pretext. [39-2]; [38], p. 28. The Fifth Circuit has stated that "when an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext." *Goudeau*, 793 F.3d at 477 (citing *Machinchick*, 398 F.3d at 350). Keesler only disciplined White twice. First, on May 10, 2021, and again on May 14, 2021, when she was terminated. [31-6]; [31-18]. No other evidence was introduced that White was on a discipline plan, was on probation, or had any prior discipline issues at Keesler.

The Fifth Circuit has recognized that when a policy is not mandatory and an employee is at-will, "these facts do not eliminate the inference of pretext raised by its failure to follow an internal company policy specifically stating that it should be [followed unless otherwise specified]." *Goudeau*, 793 F.3d at 477 (citing *Machinchick*, 398 F.3d at 354 n.29); [39-2]. There was no record of discipline before May 10, 2021—just four days before Keesler terminated White and only fourteen days after White made a claim of discrimination. [39], p. 15; [31-6]; [39-25].

White also points out the sequence of events right before her termination. [38], pps. 20-21. The Fifth Circuit has held, "[p]laintiffs may combine 'suspicious timing with other significant evidence of pretext' to survive summary judgment." *Owens*, 33 F.4th at 835 (citing *Saketkoo*, 31 F.4th at 1003). Setting aside White's charge with the EEOC, White reported Valore and MacDonald internally to Keesler's Human Resources department on April 27, 2021 . [39-25]. At that point, White had no disciplinary record while an employee with Keesler. Even so, White produced emails from Valore to McVadon with "notes" to discipline White dated April 27, 2021. [39-24]. This is the same day that White reported Valore to Keesler. [39-25]. White also gave

McVadon her seven pages of examples of discrimination on May 13, 2021, at 3:54 p.m. [39-28], at 4-15. But just minutes later, Valore added another Discipline Record to White's file at 3:57 p.m. and recommended White's termination. [39-29]. The following day, Valore terminated White. [31-6]; [39-30].

White also submitted evidence of the change to the ad hoc review before it was removed from her record. [39-37]. For more context, White pointed out that this performance review was not based on a full year, and that Williams was not present for her to address White's disputes with the review. [31-16]. White appealed the review, and the evaluation was deleted from White's record by the CEO Andrew Swogger, because of the procedural irregularities, and the score was changed to "meets expectations." *Id.* White also submits, and the Court discussed previously, that before her departure from Keesler, Williams told White that "[t]his place is going to be uncomfortable [for you] if I'm not here . . . to help" and that MacDonald was "a whole different level of evil."[39-7]; [39-9]. She also mentioned that Keesler's requirement of Williams to perform an ad hoc performance evaluation of White was a "surprise." [39-9].

The Court finds that White's evidence that Keesler did not follow its progressive disciplinary policy combined with the suspicious timing of her termination show—at least in the light most favorable to White—more evidence that Keesler's nondiscriminatory explanations are "false or 'unworthy of credence.'" *See Wallace*, 271 F.3d at 220; *Watkins*, 997 F.3d at 283 n.4 ("the timing of her discharge is also incriminating evidence of pretext"). Viewing all the evidence in the light most favorable to White, a reasonable jury could infer discrimination.

Therefore, Keesler's motion for summary judgment on White's race discrimination claim due to termination as Project Manager is denied. *See White v. Patriot Erectors LLC*, No. A-20-CV-

01219-RP, 2022 WL 5071444, at *8 (W.D. Tex. Oct. 3, 2022) (finding summary judgment improper where evidence supported inference of pretext); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) ("Neither do we suggest . . . that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

### IV. RETALIATION – EEOC COMPLAINT & *MCDONELL DOUGLAS* BURDEN SHIFTING FRAMEWORK

The Court next considers White's retaliation claim. Retaliation claims are also "subject to the *McDonnell Douglas* burden shifting framework" because White seeks to prove retaliation by circumstantial evidence. *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021); *see also Saketkoo v. Admins. Of Tulane Educ. Fund*, 31 F.4th 990, 998-1000 (5th Cir. 2022).

**A. White has proved a prima facie case for retaliation under Title VII.**

The standard to establish a prima facie case under retaliation differs from that of discrimination under the *McDonell Douglas* burden shifting framework. To establish a prima facie case of retaliation under Title VII, White must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Saketkoo*, 31 F.4th at 998-1000. Keesler concedes that White engaged in a statutorily protected activity by filing a charge with the EEOC and complaining internally to Keesler. There is no dispute that White suffered an adverse employment action when Keesler terminated White. Thus, the Court moves to the third step which asks whether there is a "causal connection" between White's EEOC charge and her termination." *Saketkoo*, 31 F.4th at 1000-01. More specifically, the Court

will analyze whether White's protected act under Title VII was a "but for" cause of the adverse employment decision. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).[20]

"At the prima facie stage, a plaintiff can meet [her] burden of causation simply by showing close enough time between [her] protected activity and [her] adverse employment action." *Brown*, 969 F.3d at 577. A "plaintiff need not prove that her protected activity was the *sole* factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Long*, 88 F.3d at 305 n.4 (citing *De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 857 n.12 (5th Cir. 1982) (emphasis added).

White filed her EEOC charge on February 5, 2021. [31-23]. White also complained internally to Keesler on April 27, 2021. [39-25]. She was then terminated on May 14, 2021. [31-6]. Only three months passed between White's EEOC charge and her termination. And only fourteen days passed between her internal complaint and her termination. [31-6]. At the prima facie stage, the Fifth Circuit has held that "a period of two-and-a half months, . . . a period of two months, . . . and a period of six-and-a-half weeks . . . are close enough to show a causal connection." *Brown*, 969 F.3d at 578 (citing *Garcia*, 938 F.3d at 243; *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 995 (5th Cir. 2005); *Porter*, 810 F.3d at 949). In fact, "a time lapse of up to four months may be

---

[20] "At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a causal link exists between the adverse employment action and the protected activity." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996). "However, the standards of proof applicable to these questions differ significantly." *Long*, 88 F.3d at 305 n.4. "The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Id.* "The standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent." *Id.*

sufficiently close." *Feist v. La. Dep't of Justice, Off. of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

Thus, this Court finds that White has shown a prima facie case of retaliation.

**B. Keesler has provided legitimate, nondiscriminatory reasons as to White's termination.**

Again, Keesler offered the reasons below in its Employee Discipline Record that resulted in White's termination:

(1) That a test plan and detailed requirements had not been completed.

(2) White had not responded to an email on May 12, 2021, about how defects are being tracked.

(3) That the Senior Director of Enterprise Applications sent an email with defects in the body.

(4) That White did not respond to emails on May 12, 2021, and May 13, 2021, from Money asking about uncompleted tasks and whether there is risk to the project.

(5) On May 11, 2021, Money asked to be included in meetings, and then had to ask a second time when he did not immediately get the invitations. [31-6].

White does not dispute that Keesler's reasons satisfy the second step of *McDonnell Douglas*. As a result, the Court moves on to the third step: pretext for retaliation.

**C. White has met her burden in rebutting the reasons Keesler put forth for her termination showing Keesler's actions were pretext that serve as retaliation for her racial discrimination complaint.**

The Fifth Circuit has consistently held that "[t]he proper standard of proof ... [for] a Title VII retaliation claim is that the adverse employment action ... would not have occurred *'but for'* [the] protected conduct." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007) (emphasis in original).

So to show pretext for a retaliation claim under Title VII, White must show "that [the] protected conduct was *the* reason for the adverse action." *Owens*, 33 F.4th at 835 (emphasis in original). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown*, 969 F.3d at 578 (citing *Garcia*, 938 F.3d at 244; *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 710-11 (5th Cir. 2016)).

White relies on the following evidence to show "but for" causation: (1) the close timing between her protected activity and termination; (2) Keesler's failure to investigate White's claims of discrimination; and (3) the "incoherencies, implausibilities, and other indicia of pretext" within the stated reasons for White's termination. [38], p. 22.

The Fifth Circuit has held that close timing or "[t]emporal proximity gets [White] through [her] prima facie case but does not, on its own, establish that [Keesler's] stated explanation for [White's] firing was mere pretext." *Garcia*, 938 F.3d at 243 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) ("[t]emporal proximity alone is insufficient to prove but for causation.")). But "[t]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment." *Id.* at 244 (quoting *Shackelford*, 190 F.3d at 409).

At most, three months passed between White's protected activity and her termination. Yet, Keesler terminated White just fourteen days after her complaint of racial discrimination to McVadon, Keesler's Vice President of Human Resources. [31-6]; [31:16]. Even so, this evidence alone cannot establish pretext. *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).

White provides more evidence to combine with the "suspicious timing" of her termination to support her claim of retaliation. *See Saketkoo*, 31 F.4th at 1003 (citing *Shackelford*, 190 F.3d at 409). The Fifth Circuit has held that an "employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the 'defendant's explanation . . . unworthy of credence' and permits an inference of discrimination." *Owens*, 33 F.4th at 829 (quoting *Reeves*, 530 U.S. at 147). Further, "such evidence does not require [the Court] to evaluate whether an employer's investigatory practices were *sufficient* or *correct*, but only whether, considered with all other evidence, they tend to permit a rational inference that the employer's ultimate reason for taking an adverse action is *unbelievable*." *Id.*

Keesler provides no evidence of investigating White's claim of discrimination. [39-30]. White introduced evidence of a memo that showed McVadon "began to review [White's] allegations, [but] received another Discipline Record" that reflected White should be terminated. *Id.* The next day, McVadon "consulted" with Keesler's counsel and "conferred with Jason MacDonald and Andrew Swoger" and agreed to terminate White. *Id.* No investigation of White's claims took place after she listed seven pages of examples and allegations of Keesler's alleged discrimination. [39-30]. Once more, this alone would not prove retaliation.

White has more though. As the Court concluded in analyzing White's termination claim, White produced substantial evidence to rebut Keesler's reasons for terminating her. Keesler has the same reasons here and White's rebuttal evidence is just as applicable. [39-9]; *See Owens*, 33 F.4th at 833 (finding plaintiff presented evidence "that directly and specifically contradicts several factual bases" of employer's reasons); *Gosby*, 30 F.4th at 529; *White*, 2022 WL 5071444, at *7; *Cherry*, 2022 WL 3636606, at *9.

4. A Fifth Circuit case also provides some guidance. In *Shackelford*, the Fifth Circuit reversed summary judgment for an employer on plaintiff's retaliation claim. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). Shackelford was warned by other employees to not "get involved [in the class action suit against D&T] if you want to keep your job." *Id.* Shackelford said she had experienced discrimination. *Id.* at 402. After sharing this information, she received two negative performance evaluations. *Id.* Shackelford was further included on a list of potential witnesses in the class action lawsuit. *Id.* One week later, the employer terminated her. *Id.* at 403. The Fifth Circuit held a reasonable juror could conclude that the employer fired Shackelford in retaliation for her protected activity. *Id.* at 409 (finding evidence of tight temporal proximity, inaccurate performance concerns, and warnings from other employees sufficient to create an issue of fact about pretext).

The same could be found here. White's evidence rebutting the Employee Discipline Record – coupled with Keesler not investigating her claims at all – and the consideration of the close timing of her protected activity and termination, can support a claim of retaliation. Thus, a reasonable fact finder could infer there was retaliation against White because of her protected activity and summary judgment is denied.

## V. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Keesler's Motion for Summary Judgment [31] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED AND ADJUDGED that White's Motion to Strike [37] is MOOT.

SO ORDERED, this the 29th day of September, 2023.

_____
TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE